# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| **United States of America,** | ) | |
| | ) | |
| | ) | **No. 19 C 6465** |
| v. | ) | |
| | ) | |
| **Eural Black,** | ) | **Judge Ronald A. Guzmàn** |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

For the reasons stated below, the Court denies Defendant's successive motion for relief under 28 U.S.C. § 2255 [5]. The Court declines to issue a certificate of appealability. Civil case terminated.

## STATEMENT

The Court assumes familiarity with the facts and procedural history of this case. As is relevant for purposes of the instant order, Black received permission from the Seventh Circuit Court of Appeals to file a successive motion under 28 U.S.C. § 2255. (Dkt. # 2.) The Court of Appeals' ruling summarizes the facts and issues as follows:

> In 2006, Black was charged with several crimes related to a far-reaching drug conspiracy and extortion scheme facilitated by rogue Chicago police officers. The second superseding indictment charged, among other offenses, conspiracy to commit racketeering, 18 U.S.C § 1962(d) (Count One); conspiracy to distribute a controlled substance, 21 U.S.C. § 846 (Count Two); conspiracy to commit Hobbs Act robbery and extortion, 18 U.S.C. § 1951 (Count Three); attempt to possess a controlled substance with the intent to distribute it, 21 U.S.C. § 846 and 18 U.S.C. § 2 (Count Five); attempt to commit Hobbs Act robbery and extortion, 18 U.S.C. §§ 1951 and 2 (Count Six); and two counts of knowingly possessing a firearm (his service arm) in furtherance of a drug trafficking crime and a crime of violence, 18 U.S.C. § 924(c) (Counts Four and Seven). Count Four was predicated on the offenses set forth in Counts One, Two, and Three. Count Seven was predicated on the offenses detailed in Counts Five and Six.
>
> At the close of evidence at trial, the district court instructed the jury. Regarding Count Four, the court told the jury that in order to render a guilty verdict, the government must prove find [sic] that (1) Black committed one of the predicate offenses listed in Count Two or Three[1] . . . , and (2) he knowingly used or carried a firearm during and in relation to that crime.

---

[1] While the indictment listed Count One as a predicate offense, the agreed-upon jury instruction as to Count Four excluded it.

The jury convicted Black on all counts. The district court sentenced him to an aggregate term of 40 years in prison: concurrent 10-year terms for all counts except Counts Four and Seven, followed by a mandatory consecutive 5-year term on Count Seven, *see* 18 U.S.C. 924(c)(1)(A)(i), and an additional mandatory consecutive 25-year term on Count Four, *see id.* 924(c)(1)(C)(i). We affirmed on direct appeal. Black unsuccessfully moved to vacate his conviction and sentence under 28 U.S.C. § 2255.

In the present application, Black proposes to challenge both his § 924(c) convictions. He first contends that his conviction on Count Four cannot stand because at least one of the possible predicate offenses – specifically, conspiracy to commit Hobbs Act robbery and extortion, 18 U.S.C. § 1951(a) – falls under the statute's residual clause, §§ 924(c)(3)(B), which is unconstitutional. *See United States v. Davis*, 139 S. Ct. 2319 (2019). And because the jury did not return a special verdict, Black argues, it is impossible to discern the precise basis for this §924(c) conviction.

(*United States v. Black*, No. 19-2543 (7th Cir. Aug. 27, 2019), Dkt. # 2) (certain citations omitted).

Because the parties agree that Count Three, the count alleging a conspiracy to commit robbery and extortion under the Hobbs Act, can no longer constitute the predicate offense for the § 924(c) count, the Court proceeds to the harmless-error analysis. *See Daniels v. United States*, 939 F.3d 898, 903 (7th Cir. 2019) ("'Since the parties do not dispute the error, we [need] only address whether the error [is] harmless.'") (citation omitted and alterations in *Daniels*). In determining what constitutes harmless error in the instant context, the Seventh Circuit recently stated as follows:

> The parties debate whether the *Chapman* or *Brecht* standard governs the harmless-error analysis. The former applies to constitutional errors identified and reviewed on direct appeal and requires the government to demonstrate that the error "was harmless beyond a reasonable doubt." *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). The latter applies to constitutional errors identified on collateral review under 28 U.S.C. § 2254. Under *Brecht v. Abrahamson*, a state prisoner must show that the error "had [a] substantial and injurious effect or influence in determining the jury's verdict." 507 U.S. 619, 623, 633-34, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993) (quotation marks omitted).
>
> The Supreme Court has not addressed which standard applies in § 2255 cases, but some of our sister circuits have adopted *Brecht* in this context. We haven't taken a firm position, and our caselaw gestures in conflicting directions. Compare *Lanier v. United States*, 220 F.3d 833, 839 (7th Cir. 2000) (applying a harmless-error test resembling the *Chapman* formulation), with *Sorich v. United*

*States*, 709 F.3d 670, 674 (7th Cir. 2013) (using the *Brecht* standard to evaluate constitutional error in jury instructions).

*Id.* (footnote 3 omitted).² Because the more recent cases apply *Brecht*, this Court does as well; the relevant analysis provides that

> [w]hen making a determination under *Brecht*, the reviewing court must make a '*de novo* examination of the record as a whole' to decide whether a properly instructed jury would have arrived at the same verdict, absent the error. If a habeas court "has so much as a 'grave doubt as to the harmlessness of [a constitutional error], it should grant relief.'"

*Czech v. Melvin*, 904 F.3d 570, 577 (7th Cir. 2018) (internal citations omitted); s*ee also Sorich*, 709 F.3d at 674 ("This inquiry does not ask whether the jurors 'were . . . right in their judgment, regardless of the error or its effect upon the verdict. It is rather what effect the error had or reasonably may be taken to have had upon the jury's decision.'") (quoting *Kotteakos v. United States*, 328 U.S. 750, 764 (1946)).³

Having presided over the trial and after reviewing the trial transcript and the Seventh Circuit's opinion on direct appeal, the Court is confident that a properly-instructed jury would have convicted Defendant on Count Four.

---

² In *Sorich*, the Seventh Circuit used the *Brecht* standard because the parties agreed that was the appropriate standard. *Sorich*, 709 F.3d at 674 (noting that because "[t]he parties both take the position that on collateral review, the error in instructions will result in reversal only if the error had 'substantial and injurious effect or influence in determining the jury's verdict'. . . . [w]e will apply this standard as well.").

³ The parties dispute who has the burden of proof. But, as the Supreme Court has stated, assigning a burden of proof is not necessary in the instant context:

> [W]e note that we deliberately phrase the [harmlessness] issue in this case in terms of a judge's grave doubt, instead of in terms of 'burden of proof.' The case before us does not involve a judge who shifts a 'burden' to help control the presentation of evidence at a trial, but rather involves a judge who applies a legal standard (harmlessness) to a record that the presentation of evidence is no longer likely to affect. In such a case, we think it conceptually clearer for the judge to ask directly, 'Do I, the judge, think that the error substantially influenced the jury's decision?' than for the judge to try to put the same question in terms of proof burdens (e.g., 'Do I believe the party has borne its burden of showing . . .?').

*O'Neal v. McAninch*, 513 U.S. 432, 436-37 (1995); *see also Sorich*, 709 F.3d at 674 (applying the "grave doubt" standard without assigning a burden). Accordingly, the Court simply asks whether, after reviewing the record, it has "grave doubt" about the harmlessness of the agreed error.

3

The evidence at trial included the testimony of one of the corrupt police officers, Erik Johnson, who testified for the government as a cooperating witness. Johnson stated that he and Defendant, who was Johnson's partner at the relevant time, agreed to steal drugs from suspects and give the drugs to Broderick Jones, the officer who coordinated the robberies, for payment. While the first planned robbery never occurred because the drug courier did not appear as Jones had indicated, the second attempt to steal drugs was successful. According to Johnson, a couple of weeks after the first robbery failed to materialize, Jones called him again with another opportunity to steal drugs in exchange for $8,000.00 to $10,000.00. (*U.S. v. Black*, 05 CR 70, 5/2/07 Trial Tr., Dkt. # 569, at 101-02.) Johnson testified that it was his understanding that "[t]he narcotics would be recovered[] [and] sold[,] and from that, myself and [Defendant] would receive a profit from that." (*Id*. at 102.) Johnson stated that both Defendant and Jones had their guns drawn when they pulled over the SUV that was the target of the robbery. (*Id*. at 104.) After Defendant placed the driver of the SUV in the police car, and Jones looked inside the SUV, all three officers briefly relocated the police car and the SUV because a group of people had begun congregating. (*Id*. at 106.) At the second location, the officers released the driver without arresting him, and Johnson and Defendant drove Jones back to his car, where Jones told Johnson he would call to let them know when and where they would receive payment. (*Id*. at 107.) Johnson testified that later that night, Jones gave Defendant and him $12,000.00 for the robbery, which they split evenly. (*Id*. at 111.)

Approximately a month later, Jones again contacted Johnson about participating in a third robbery. Specifically, Johnson testified that he was on patrol duty with Defendant when Jones told them "about [a] male Hispanic in [a] black Chevy Blazer [who] [w]as a courier for narcotics, and . . . [Jones] wanted us to curb [the driver] and recover the narcotics." (*U.S. v. Black*, 05 CR 70, 5/2/07 Trial Tr., Dkt. # 570, at 129.) When asked at trial what Jones told him to do with any drugs he and Defendant obtained during the stop, Johnson responded, "Just like before, recover the narcotics, give them to [Jones], and he'll sell them and we'll get paid." (*Id*.) Johnson and Defendant did not find anything in the Blazer and they participated in no more robberies with Jones.

Johnson also testified that he and Defendant, without Jones' involvement, had robbed some individuals of cash. As detailed in Defendant's motion, Johnson testified as follows:

> Q. Did you continue though to steal from people that you arrested as a Chicago Police Department officer?
>
> A. Not when I was with [my former partner] Dudley, no.
>
> Q. When did that activity start back up again?
>
> A. When I partnered with [Defendant].
>
> Q. How often would you say that you and [Defendant] stole money from suspects?
>
> A. Maybe three or four times.

4

> Q. How would you and [Defendant] decide who to steal from?
>
> A. Well, what would happen is when we would make an arrest of somebody, we would have – ask them how much money do they have or display the money . . . in front of them. And if they would kind of be close on what they might have, you know . . . , but we wouldn't actually say anything. It would be more like a feeling we would get between us. And, you know, if it didn't feel right, of course, you wouldn't do it.
>
> Q. How much money would you typically take?
>
> A. About maybe 50.
>
> Q. And would that be split between the two of you?
>
> A. That is correct.
>
> Q. How many times would you guess that happened?
>
> A. I would say maybe three or four.

(*U.S. v. Black*, 05 CR 70, 5/2/07 Trial Tr., Dkt. # 569, at 88.)

Defendant argues that if the finding of guilt on Count Three, the Hobbs Act conspiracy, was premised on Johnson's and Defendant's robberies involving only cash, and not those committed with Jones that involved drugs, then the § 924(c) count cannot stand. But Defendant sets forth no basis on which to conclude that this is the proper interpretation of the jury's verdict. No evidence in the record indicates that the Hobbs Act conspiracy count was based on the cash robberies described by Johnson, and the government did not contend that it was. In its opening statement, the government characterized this case as one about "a rogue band[] of police officers[,] who in 2004 participated in . . . drug ripoffs." (*Id*. at 18.) More importantly, in its closing argument, when discussing the Hobbs Act conspiracy, the government stated:

> [T]here's one other aspect of [the Hobbs Act conspiracy count] that you will have to find that – there's essentially an effect on interstate commerce that goes with that. That is not going to be an issue for you in this case *because these deals involve cocaine*. Cocaine – you heard a stipulation between the parties . . . . that the transportation of cocaine affects interstate commerce. *So once you make a determination that cocaine is involved, you don't have to worry about that particular aspect*.

(*U.S. v. Black*, 05 CR 70, 5/10/07 Trial Tr., Dkt. # 579, at 1070) (emphasis added). The government expressly tied the Hobbs Act conspiracy count to stealing drugs; no part of the government's closing argument asserted that the cash robberies by Johnson and Defendant provided a basis for conviction on the Hobbs Act conspiracy count.

5

Instead, as the government argues in its responsive briefs, the drug-trafficking conspiracy (Count Two) and the Hobbs Act conspiracy (Count Three) are based on the same conduct. Much of the language of Counts Two and Three in the second superseding indictment is almost identical, as demonstrated by comparing the following excerpts from the second superseding indictment:

> Paragraph 4 (Counts Two and Three)
>
> It was further part of the conspiracy that Jones received information about the activities of various individuals from Wilson, Walker, DRIVER, TERRY, Montgomery, and others. This information was provided to Jones to enable Jones and other CPD officers and individuals to illegally obtain controlled substances, money, and property, including weapons, from individuals, and so that Jones and the other CPD officers and individuals would share with them the proceeds of any controlled substances, money, and property, including weapons, illegally obtained from the individuals.
>
> Paragraph 5 (Counts Two and Three)
>
> It was further a part of the conspiracy that Jones recruited CPD officers, including Haynes, BLACK, Flagg, Johnson, and others, to conduct vehicle stops and home invasions of individuals in order to illegally obtain controlled substances, money, and property, including weapons, from those individuals.
>
> Paragraph 6 (Counts Two and Three)
>
> It was further a part of the conspiracy that Jones, Haynes, BLACK, Flagg, and Johnson agreed to conduct vehicle stops and home invasions of individuals, and did conduct such stops, not for legitimate law enforcement purposes, but for the purpose of illegally obtaining controlled substances, money, and property, including weapons, from those individuals.
>
> Paragraph 7 (Counts Two and Three)
>
> It was further a part of the conspiracy that Jones, Haynes, BLACK, Flagg, and Johnson used their power, authority, official position, and knowledge as law enforcement officers to promote and protect the operation of the conspiracy.
>
> Paragraph 8 (Counts Two and Three)
>
> It was further a part of the conspiracy that Jones, Haynes, BLACK, Flagg, and Johnson used the facilities and equipment of the CPD, including, but not limited to CPD badges, vehicles, guns, bullet-proof vests, and handcuffs, to promote and protect the operation of the conspiracy.
>
> Paragraph 9 (Counts Two and Three)

> It was further a part of the conspiracy that Wilson, Walker, DRIVER, TERRY, Montgomery, and others further assisted the CPD officers in illegally obtaining and attempting to illegally obtain controlled substances, money, and property, including weapons, among other ways, by ordering controlled substances from individuals, by providing the CPD officers with information about the methods and means used by these individuals to store and sell their controlled substances, and by luring these individuals to certain locations where those individuals could be stopped by the CPD officers and have their controlled substances and money taken by the CPD officers.
>
> Paragraph 10 (Counts Two and Three)
>
> It was further a part of the conspiracy that after illegally obtaining controlled substances from individuals, Jones and others delivered and caused these controlled substances to be delivered to another individual or individuals in exchange for cash, which Jones shared with his coconspirators.
>
> Paragraph 11 (Counts Two and Three)
>
> It was further a part of the conspiracy that in or about the summer of 2004, Jones, BLACK, and Johnson conducted a vehicle stop of an individual to illegally obtain controlled substances and/or cash from that individual near 92nd Street and Indiana Avenue in Chicago. Jones later shared the proceeds of this ripoff, in the form of cash, with BLACK and Johnson.
>
> Paragraph 12 (Counts Two and Three)
>
> It was further a part of the conspiracy that on or about July 21, 2004, Jones, Haynes, BLACK, Wilson, Flagg, and Johnson attempted to illegally obtain multiple kilograms of cocaine from at least two individuals near a car wash located in the 8500 block of South Ashland Avenue in Chicago.

(*U.S. v. Black*, 05 CR 70, 2d Superseding Indictment, Dkt. # 282.)

Several of the subsequent paragraphs differ because they describe some activities that Defendant was not involved in, but the last five paragraphs of each of the counts are nearly identical, with one insignificant difference. The Court lays out these allegations in detail in order to demonstrate that while the counts focus on different criminal aspects of the conduct, the conspiracies set forth in Counts Two and Three are overlapping and coextensive. *See Sorich*, 709 F.3d at 675-75 ("[W]e conclude that the jury would still have convicted the petitioners on the money/property fraud allegations even if it had not received an honest-services fraud theory to consider. . . . [T]he two fraud theories here were coextensive; any honest-services violation had to be premised on money/property fraud. The government alleged, and the evidence showed, a single scheme by the petitioners to fraudulently award City jobs and promotions to individuals based on political considerations despite the outward appearance that all City hiring policies and procedures were being followed.").

Moreover, as to Defendant, the evidence supporting conviction in each was the same – the government presented testimony and audio recordings of cell phone calls demonstrating that Defendant, along with his codefendants, used his position as a police officer to conduct traffic stops of drug couriers in order to steal drugs and hand them over to be sold.  The jury convicted Defendant on all of the counts with which he was charged, including Counts Five (attempt to possess with intent to distribute five kilograms or more of cocaine), Six (attempted Hobbs Act robbery/extortion), and Seven (§ 924(c) charge), which were based on the July 21, 2004 planned robbery.  Based on all of the above, the Court finds that the jury would have arrived at the same verdict, absent the error, and that the Hobbs Act conspiracy theory and instruction did not have a "substantial and injurious effect or influence" on the jury's § 924(c) verdict as to Count Four.  Because the Court has no "grave doubt" as to the harmlessness of the jury-instruction error, Defendant's successive § 2255 motion is denied.

Under § 2255 Rule 11(a), "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant."  A petitioner is entitled to a certificate of appealability only if he can make a substantial showing of the denial of a constitutional right.  *See* 28 U.S.C. § 2253(c); *White v. United States*, 745 F.3d 834, 835 (7th Cir. 2014).  Under this standard, Defendant must demonstrate that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) (internal quotation marks omitted); *Lavin v. Rednour*, 641 F.3d 830, 832 (7th Cir. 2011) (similar).  Defendant has failed to make that showing, so a certificate of appealability is denied.

**Date:** March 25, 2020

**Ronald A. Guzmàn**
**United States District Judge**